784 N.W.2d 873 (2010)
280 Neb. 96
STATE of Nebraska, appellee,
v.
Ryan T. PRESCOTT, appellant.
No. S-09-721.
Supreme Court of Nebraska.
June 25, 2010.
*878 T. Charles James, of Langvardt & Valle, P.C., Hastings, for appellant.
Jon Bruning, Attorney General, and Erin E. Tangeman, for appellee.
HEAVICAN, C.J., WRIGHT, CONNOLLY, GERRARD, STEPHAN, McCORMACK, and MILLER-LERMAN, JJ.
McCORMACK, J.

NATURE OF CASE
Following a bench trial before the Hall County Court, Ryan T. Prescott was found guilty of driving under the influence (DUI). The county court found it to be Prescott's second offense and sentenced him to 6 months' probation. Prescott appealed to the Hall County District Court, which affirmed. Prescott then filed this appeal. We granted Prescott's petition to bypass.

BACKGROUND
Prescott was stopped for speeding at about 8 p.m. on July 31, 2007, in Hall County, Nebraska. Trooper Robert Almquist of the State Patrol had visually estimated that Prescott was speeding, then clocked Prescott by radar traveling 65 miles per hour in a 55-mile-per-hour zone.
Upon approaching Prescott's stopped vehicle, Almquist observed a firearm in the vehicle. As such, Almquist had Prescott turn off the vehicle and raise his hands. Prescott complied, and Almquist approached closer to get Prescott's license and registration. At that time, Almquist testified, he detected a moderate odor of alcohol.
Almquist and Prescott then had a seat in Almquist's patrol car. During this interaction, Almquist noted a moderate odor of alcohol coming from Prescott's breath. In addition, after questioning, Prescott admitted that he had not had anything to eat since 11:30 a.m., that he weighed about 165 pounds, and that he had been drinking alcohol prior to driving. Specifically, Prescott indicated that he had consumed two *879 beers since leaving work at around 6 p.m. Almquist also learned that Prescott had a prior arrest for DUI.
Almquist then administered three field sobriety tests, as well as a preliminary breath test (PBT). Prescott showed signs of impairment on the horizontal gaze nystagmus (HGN) test and the nine-step walk-and-turn test. He then performed the one-leg stand test as instructed, but failed the PBT. Almquist placed Prescott under arrest and transported him to a hospital for a blood draw. A sample was drawn and tested. It showed that Prescott had a blood alcohol content of .093 of 1 gram of alcohol per 100 milliliters of blood.
Prescott was charged in Hall County Court with second-offense DUI. Prescott filed a motion to suppress all evidence seized after the traffic stop. He also alleged in that motion that Neb.Rev.Stat. § 60-6,197.04 (Reissue 2004) was unconstitutional. The county court denied Prescott's motion to suppress. A bench trial was then held. Prescott was found guilty and was sentenced to 6 months' probation. The conviction and sentence were affirmed on appeal to the Hall County District Court. Prescott now appeals to this court.

ASSIGNMENTS OF ERROR
On appeal, Prescott assigns, restated, that the county court erred in (1) concluding that there was probable cause to support the stop of his vehicle; (2) concluding that there was reasonable suspicion to perform field sobriety tests on him; (3) concluding that there was probable cause to arrest him, because the field sobriety tests did not establish impairment; (4) not finding that the results of the PBT lacked sufficient foundation to be admissible; and (5) admitting the results of his blood test. In addition, Prescott also assigns that § 60-6,197.04 is unconstitutional on its face and as applied.

STANDARD OF REVIEW
Both the district court and the Nebraska Supreme Court generally review appeals from the county court for error appearing on the record.[1] In an appeal of a criminal case from the county court, the district court acts as an intermediate court of appeal, and as such, its review is limited to an examination of the county court record for error or abuse of discretion.[2]
When reviewing a criminal conviction for sufficiency of the evidence to sustain the conviction, the relevant question for an appellate court is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.[3] An appellate court does not resolve conflicts in the evidence, pass on the credibility of witnesses, or reweigh the evidence. Such matters are for the finder of fact.[4]
In reviewing a trial court's ruling on a motion to suppress based on the Fourth Amendment, we will uphold its findings of fact unless they are clearly erroneous.[5] But we review de novo the trial court's ultimate determinations of reasonable suspicion to conduct an investigatory stop and probable cause to perform a warrantless search.[6]
The constitutionality of a statute is a question of law, regarding which the *880 Supreme Court is obligated to reach a conclusion independent of the determination reached by the trial court.[7]

ANALYSIS

PROBABLE CAUSE FOR STOP
Almquist testified that he stopped Prescott for speeding, based on his visual observation, which was confirmed by radar. In his first assignment of error, Prescott contends that the State did not sufficiently prove that he was speeding and that thus, probable cause for the stop was not shown. In particular, Prescott argues that under Neb.Rev.Stat. § 60-6,192(1) (Reissue 2004), the State failed to show sufficient foundation to introduce into evidence the radar results allegedly showing that Prescott was speeding.
Traffic violations, no matter how minor, create probable cause to stop the driver of a vehicle.[8] In determining whether the government's intrusion into a motorist's Fourth Amendment interests was reasonable, the question is not whether the officer issued a citation for a traffic violation or whether the State ultimately proved that violation.[9] Instead, an officer's stop of a vehicle is objectively reasonable when the officer has probable cause to believe that a traffic violation has occurred.[10]
In State v. Howard,[11] this court was presented with similar facts. A driver was charged with reckless driving. Part of the case against him was based upon the speeds he was traveling. We concluded that the State did not need to corroborate the officer's testimony regarding the speed of the vehicle where the charge pending against the driver was not speeding.[12] We find Howard applicable here and conclude that the State did not need to corroborate Almquist's testimony that he stopped Prescott for speeding. Prescott's first assignment of error is without merit.

REASONABLE SUSPICION TO PERFORM FIELD SOBRIETY TESTS
In his second assignment of error, Prescott argues that Almquist lacked reasonable suspicion to perform field sobriety tests. Once a vehicle is lawfully stopped, a law enforcement officer may conduct an investigation reasonably related in scope to the circumstances that justified the traffic stop.[13] In order to continue to detain a motorist, an officer must have a reasonable, articulable suspicion that the person is involved in criminal activity beyond that which initially justified the stop.[14] We have further held that an officer is required to have only a reasonable, articulable suspicion that a motorist was driving under the influence in order to expand the scope of the initial traffic stop and detain him or her for field sobriety tests.[15] Whether a police officer has a reasonable suspicion based on sufficient articulable facts depends on the totality of the circumstances.[16] Courts must *881 determine whether reasonable suspicion exists on a case-by-case basis.[17] Reasonable suspicion entails some minimal level of objective justification for detention. It is something more than an inchoate and unparticularized hunchbut less than the level of suspicion required for probable cause.[18]
In this case, Almquist testified that he conducted field sobriety tests after noting a moderate odor of alcohol coming first from Prescott's vehicle and later from Prescott himself. In addition, Almquist testified that Prescott told him that he had consumed two beers and, further, had not had anything to eat since lunch that day (the stop was at approximately 8 p.m.). This was sufficient to provide Almquist with reasonable suspicion to conduct field sobriety tests on Prescott. Prescott's second assignment of error is without merit.

ESTABLISHMENT OF IMPAIRMENT BY FIELD SOBRIETY TESTS
In his third assignment of error, Prescott assigns that the field sobriety tests administered to him did not establish that he was impaired and contends that accordingly, Almquist lacked probable cause to arrest him. Almquist administered three field sobriety tests to Prescott in advance of a PBT: the HGN test, the nine-step walk-and-turn test, and the one-leg stand test. Prescott successfully completed the one-leg stand test, but showed signs of impairment on the other two.
Starting first with the HGN test, Prescott argues that Almquist did not perform the test in keeping with the requirements set forth in the National Highway Traffic Safety Administration manual[19] detailing the test. In particular, Prescott complains that the manual indicates that the test should take 80 seconds, but that it did not take Almquist 80 seconds to administer the test.
This court has held that a police officer may testify to the results of HGN field sobriety testing if it is shown that the officer has been adequately trained in the administration and assessment of the test and has conducted the testing and assessment in accordance with that training.[20]
In this case, Almquist testified to his training regarding the HGN test. He explained what the HGN test was and explained that impaired persons often show an involuntary jerking of the eye, known as nystagmus. In addition, Almquist explained the steps he took to administer the test to Prescott and testified that Prescott showed four indicators on the test, demonstrating impairment. This finding of impairment is consistent with the manual. The manual indicates that with four indicators present, it is likely that a person's blood alcohol concentration is above .10.
Prescott's argument appears to be without merit. First, it is not at all clear from the record exactly how long it took Almquist to perform the test. Nor is there anything in the record, in particular in the manual, suggesting that the HGN indicators are not valid if the test did not take 80 seconds to perform. Finally, the manual itself notes:
The procedures outlined in this manual describe how the [field sobriety tests] are to be administered under ideal conditions. *882 We recognize that the [tests] will not always be administered under ideal conditions in the field, because such conditions will not always exist. Even when administered under less than ideal conditions, they will generally serve as valid and useful indicators of impairment. Slight variations from the ideal ... may have some affect [sic] on the evidentiary weight given to the results. However, this does not necessarily make the [tests] invalid.[21]
We next turn to the nine-step walk-and-turn test. Prescott argues that Almquist could have asked him "proper medical questions pursuant to his training"[22] to establish whether his "normal gait"[23] could have caused him to miss the heel-to-toe steps during this particular field sobriety test. But Prescott does not argue that he actually does suffer from any abnormality in his "normal gait." There is no evidence in the record that Prescott's inability to successfully complete the nine-step walk-and-turn test was due to his "normal gait." Moreover, this would not affect the admissibility of the test results, but instead goes to the weight or credibility of this evidence.
Prescott's third assignment of error is without merit.

ADMINISTRATION OF PBT
In his fourth assignment of error, Prescott argues that there was insufficient foundation to support the admissibility of the results of the PBT. He further contends that without these results, Almquist lacked probable cause to arrest him for DUI.
Prescott first argues that the breath testing device used to perform the PBT on Prescott was not an approved device under the pertinent regulations. Specifically, to be approved, a device must use fuel cell analysis, but Almquist did not testify that the particular model he used had such analysis. And while a review of Almquist's testimony reveals that he did not specifically testify that the device used had fuel cell analysis, the record does show that Almquist testified that he followed title 177 of the Nebraska Administrative Code[24] in administering the PBT. Prescott did not rebut this claim. We conclude that this testimony is sufficient to support the introduction of this evidence.[25]
Prescott also asserts that there was insufficient evidence that the device had been properly calibrated. But Almquist testified that it was calibrated as required under title 177 and that he confirmed this fact prior to administering the PBT to Prescott.
Prescott next contends that the State failed to offer into evidence a checklist to show what times Almquist utilized to establish the 15-minute observation period required under title 177. This court held in State v. Dail[26] that the actual checklist need not be entered into evidence; it is sufficient that the officer testify that he followed the instructions in the checklist in administering the test.
Finally, Prescott argues that there was insufficient evidence to support a finding that he was actually observed by Almquist for the full 15 minutes and also insufficient evidence as to the digital results of the *883 test. But the record does not support this contention. A review of the video of the stop shows that at least 15 minutes elapsed between the initial contact between Almquist and Prescott and the administration of the PBT. And on the video, Almquist is heard telling Prescott that his result was.093.
Prescott's fourth assignment of error is without merit.

ADMISSIBILITY OF RESULTS OF BLOOD TEST
In his fifth assignment of error, Prescott argues that it was error for the county court to receive into evidence the results of the blood test finding his blood alcohol content to be .093. The basis for this argument is Prescott's contention that the State did not establish compliance with title 177.
To be considered valid, blood tests under Neb.Rev.Stat. § 60-6,197 (Reissue 2004) shall be performed pursuant to methods approved by the Department of Health and Human Services.[27] Any deficiencies in the techniques used to test the blood alcohol level in DUI cases generally are of no foundational consequence, but only affect the weight and credibility of the testimony.[28] Under title 177, a technique is defined as a "set of written instructions which describe the procedure, equipment, and equipment preventive maintenance necessary to obtain an accurate alcohol content test result."[29] A method, however, is "the name of the principle of analysis."[30]
Prescott's first argument is that the person who drew his blood failed to put the full date or time on the tubes of blood she drew from him and thus failed to comply with title 177. Title 177 does provide that the following shall be listed on the label of the specimen container: name of person tested, date and time of collection, and initials of person collecting specimen.[31]
A review of the record shows that title 177 was complied with. The initials of the collector are on the container, as is the time of collection. The date, but not the year, is also on the label. But the year, along with the month and day, is on the security seal on the container. And that month and day match those on the label and also match the whole date listed on the requisition form also in the record. Moreover, any deficiency in the date would go to the weight of this evidence and not to its admissibility.
Prescott next contends that § 005.02 of title 177, chapter 1, was not complied with in that there was insufficient evidence presented to show that the specimen container in which his blood was collected contained an anticoagulant. But the collector of the specimen testified that there was such an anticoagulant in the tube, as it was placed there by the manufacturer.
Prescott also argues that there was insufficient evidence that the hospital was properly certified to test his blood. Prescott relies on § 60-6,201(3) and State v. Trampe,[32] to support this argument.
The technologist testified that the hospital was certified and that, in addition, she had a permit to test blood in the manner in which she did. Neither § 60-6,201(3) nor Trampe explicitly provides that an actual copy of the certification is necessary. And both § 60-6,201(3) and Trampe relate to *884 certification in the context of the collection of a specimen by a person who does not hold the proper permit: In certain instances, medical personnel of a properly certified facility can take samples without a permit, and in those situations, more evidence of certification might be necessary. Neither Trampe nor § 60-6,201(3) holds what Prescott claims they do. Prescott's argument on this point is without merit.
Prescott next asserts that the technologist was required under 177 Neb. Admin. Code, ch. 1, § 006.04C1c, to "[i]ntroduce at least 0.050 ml volume of specimen into the sample cartridge" when testing a sample under the radiative energy attenuation method and that there was no testimony that the technologist did so.
Prescott is correct that there was not testimony on this point. However, the technologist did testify that she conducted all testing as required by title 177. And as noted above, title 177 does require a .050 milliliter volume of specimen. We conclude that the technologist's testimony was sufficient to show that the proper volume of specimen was introduced.[33]
Finally, Prescott contends that the technologist's permit did not authorize her to conduct testing via the radiative energy attenuation method that was used in this case. But under title 177, one of the approved testing methods for a Class A permit, which the technologist in this case had, was the radiative energy attenuation method using the analyzer employed in this case. Prescott's argument that the technologist was not authorized in this case is without merit.
Prescott's fifth assignment of error is without merit.

CONSTITUTIONALITY OF § 60-6,197.04
In his sixth and final assignment of error, Prescott argues that § 60-6,197.04 is unconstitutional as applied and on its face.
Section § 60-6,197.04 provides in part:
Any peace officer who has been duly authorized to make arrests for violation of traffic laws of this state or ordinances of any city or village may require any person who operates or has in his or her actual physical control a motor vehicle in this state to submit to a preliminary test of his or her breath for alcohol concentration if the officer has reasonable grounds to believe that such person has alcohol in his or her body, has committed a moving traffic violation, or has been involved in a traffic accident.
The crux of Prescott's position is that this section is unconstitutional because a breath test is a search, and a search must be supported by probable cause. In Prescott's view, the reasonable grounds required by § 60-6,197.04 are constitutionally insufficient, and instead, an officer must have probable cause to require a person to submit to a PBT.
As an initial matter, we note that the State argues that Prescott waived the constitutional issue by failing to file a motion to quash and additionally by failing to insist upon a specific ruling by the county court.
Neb.Rev.Stat. § 29-1808 (Reissue 2008) provides that "[a] motion to quash may be made in all cases when there is a defect apparent upon the face of the record, including defects in the form of the indictment or in the manner in which an offense is charged." While ordinarily one must file a motion to quash in order to preserve a constitutional challenge to the facial validity of a statute,[34] in this case the *885 statute in question, § 60-6,197.04, was not the charging statute. Nor was its application in this instance apparent from the face of the record. Under such circumstances, not only was it unnecessary for Prescott to file such a motion, it would have been inappropriate to do so. We therefore reject the State's assertion that Prescott waived his facial challenge by failing to file a motion to quash.
We also reject the State's argument that Prescott waived his constitutional argument by failing to insist upon a ruling on his constitutional challenge as set forth in his motion to suppress. In this case, the county court denied Prescott's motion to suppress. Implicit in that finding was the county court's rejection of Prescott's constitutional argument.
Having concluded that Prescott did not waive his constitutional challenge, we address the merits of his claim that § 60-6,197.04 is unconstitutional because it does not require probable cause to administer a PBT. We assume without deciding that a PBT would constitute a search under the Fourth Amendment.
The Vermont Supreme Court recently addressed this issue of whether probable cause was necessary to support a PBT in State v. McGuigan.[35] There, the court concluded:
PBTs are common tools in the investigatory kit officers use to ascertain whether probable cause exists to believe that an individual has been driving under the influence of alcohol. PBTs are "quick and minimally intrusive" yet "perform[] a valuable function as a screening device" to detect drunk driving.... The relatively limited intrusion into a suspect's privacy is outweighed by the important public-safety need to identify and remove drunk drivers from the roads.... We thus find it reasonable, under ... the Fourth Amendment ... for an officer to administer a PBT to a suspect if she can point to specific, articulable facts indicating that an individual has been driving under the influence of alcohol.[36]
This court cites this same reasoning in State v. Royer[37] in concluding that field sobriety tests may be justified upon a police officer's reasonable suspicion based upon specific articulable facts that the driver is under the influence of alcohol or drugs.
In Royer, we noted that courts had concluded that field sobriety tests were more akin to a Terry stop as authorized by Terry v. Ohio,[38] and were reasonable so long as an officer could point to "`specific articulable facts'"[39] supporting the stop and limited intrusion. In this case, we agree that the administration of a PBT is more in line with field sobriety testing and a Terry stop than it would be with a formal arrest. We therefore conclude that the administration of a PBT does not need to be supported by probable cause.
Because a PBT is quick and minimally intrusive, and because the State has a compelling interest in removing drunk drivers from its highways, we find that an officer is reasonable in administering a PBT if he can point to specific, articulable facts indicating that an individual has been driving under the influence of *886 alcohol. Prescott's sixth and final assignment of error is without merit.

CONCLUSION
We find no merit to Prescott's assignments of error. The decision of the district court is affirmed.
AFFIRMED.
NOTES
[1] State v. Thompson, 278 Neb. 320, 770 N.W.2d 598 (2009).
[2] Id.
[3] State v. Pischel, 277 Neb. 412, 762 N.W.2d 595 (2009).
[4] Id.
[5] Id.
[6] Id.
[7] State v. Vela, 279 Neb. 94, 777 N.W.2d 266 (2010).
[8] State v. Draganescu, 276 Neb. 448, 755 N.W.2d 57 (2008).
[9] See id.
[10] Id.
[11] State v. Howard, 253 Neb. 523, 571 N.W.2d 308 (1997).
[12] See, also, State v. Hiemstra, 6 Neb.App. 940, 579 N.W.2d 550 (1998), disapproved on other grounds, State v. Trampe, 12 Neb.App. 139, 668 N.W.2d 281 (2003).
[13] State v. Royer, 276 Neb. 173, 753 N.W.2d 333 (2008).
[14] Id.
[15] Id.
[16] Id.
[17] See id.
[18] See id.
[19] National Highway Traffic Safety Administration, DWI Detection and Standardized Field Sobriety Testing Student Manual (2006).
[20] State v. Baue, 258 Neb. 968, 607 N.W.2d 191 (2000).
[21] DWI Detection and Standardized Field Sobriety Testing Student Manual, supra note 19, preface.
[22] Brief for appellant at 26-27.
[23] Id. at 26.
[24] 177 Neb. Admin. Code, ch. 1 (2004).
[25] See State v. Green, 223 Neb. 338, 389 N.W.2d 557 (1986). See, also, State v. Trampe, supra note 12.
[26] State v. Dail, 228 Neb. 653, 424 N.W.2d 99 (1988).
[27] Neb.Rev.Stat. § 60-6,201(3) (Cum.Supp. 2008).
[28] State v. Green, supra note 25.
[29] 177 Neb. Admin. Code, ch. 1, § 001.21.
[30] Id. at § 001.16.
[31] Id. at § 005.03.
[32] State v. Trampe, supra note 12.
[33] See State v. Green, supra note 25. See, also, State v. Trampe, supra note 12.
[34] See State v. Kanarick, 257 Neb. 358, 598 N.W.2d 430 (1999).
[35] State v. McGuigan, 184 Vt. 441, 965 A.2d 511 (2008).
[36] Id. at 449, 965 A.2d at 516-17 (citations omitted).
[37] State v. Royer, supra note 13.
[38] Terry v. Ohio, 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968).
[39] State v. Royer, supra note 13, 276 Neb. at 179, 753 N.W.2d at 340.